IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE, FLORIDA DIVISION

STEPHEN W. TUCKER, individually
and as Personal Representative for the
Estate of TAMMY J. TUCKER,
deceased,

    Plaintiff,

v.

PACCAR, Inc., d/b/a Peterbilt, a
foreign corporation,

    Defendant/
    Third Party Plaintiff,

v.

P.A.T. AUTO TRANSPORT, INC.,

    Third Party Defendant.

CIVIL ACTION NO.
3:03-cv-1039-j-20mcr

## THIRD-PARTY PLAINTIFF PACCAR, INC.'S MOTION TO EXCLUDE THE TESTIMONY OF ALLAN KAM

Pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and FED.R.EVID. 702, 703 and 403, Defendant Peterbilt Motors Company, an unincorporated division of PACCAR Inc. ("PACCAR"), moves this Court to exclude any and all evidence and to prohibit any and all exhibits, questions, references, testimony, and arguments in the presence of the jury concerning the opinions or work of Allan Kam. In support of this Motion, Defendant states as follows:

### I.  INTRODUCTION

This is an action for common law indemnity resulting from the underlying, original lawsuit between Plaintiff Stephen Tucker and PACCAR. That underlying lawsuit

arose out of a motor vehicle accident that occurred on or about March 6, 2002, on an ice-covered interstate in South Dakota when Tammy Tucker, an agent or employee of P.A.T., a commercial carrier, lost control of her PACCAR-manufactured Peterbilt truck and suffered fatal injuries. Plaintiff's Complaint alleged that the driver's door inadvertently opened after plaintiff lost control of her vehicle. As a proximate result, Tammy Tucker, who was not belted, fell from the vehicle and was killed. Stephen Tucker, the original plaintiff, was injured in the crash.  His Complaint sought monetary damages for the wrongful death of his wife and for his own injuries based on claims against PACCAR for negligence and strict liability.

At the time of the accident, the door latch and door latch linkage system in the Tucker vehicle were the subject of a federal safety recall campaign initiated by PACCAR on or about June 27, 2001.  The safety recall specified repairs necessary to correct a condition on affected PACCAR trucks where, under certain conditions, the door could open unexpectedly and allow unbelted occupants to fall out.  As part of the recall campaign, affected vehicles would be repaired by PACCAR at no cost to the owner.

Plaintiff's underlying Complaint alleged, in part, that PACCAR negligently conducted its recall campaign. PACCAR's Third-Party Complaint alleges that P.A.T. failed in its duties to act in response to the recall notice letters provided to it and in failing to make the repairs required by the recall. PACCAR alleges that because P.A.T. failed to comply with the recall notice letters as required under the federally-prescribed regulatory framework that PACCAR is entitled to indemnity from and against P.A.T. Alternatively, PACCAR alleges that any liability on its part was only technical, and that P.A.T. is responsible for the wrongdoing of its employees and, on the basis of respondeat superior,

2

P.A.T. is liable to indemnify PACCAR for any attributed liability based on the negligence of its employees. Pursuant to Florida law, PACCAR seeks indemnity from P.A.T. as to the amount of the settlement between Tucker and PACCAR, as well as fees and expenses incurred by PACCAR in defense of that action and in prosecution of the Third-Party Complaint.

Plaintiff Tucker originally designated Allan Kam as a NHTSA expert. He was later adopted by P.A.T. Kam's opinions concern supposed failures on the part of PACCAR in initiating and performing the subject recall. *See* Exh. A, Dep. of Allan Kam, p. 121. In deposition, Kam explained that the central points to his opinions were: (1) that PACCAR should have discovered and initiated the recall issue sooner; (2) that PACCAR should have had a better internal system in place for recognizing vehicle problems; and (3) that PACCAR did not send P.A.T. the first recall notice regarding the Tucker vehicle, therefore the second recall notice was untimely. *See* Exh. A, Dep. of Allan Kam, p. 121. At deposition, however, Kam made clear that his opinions were largely based on conversations had with P.A.T. officials where they "*said* they didn't get the notification letters about" the recall. *See* Dep. of Allan Kam, pp. 149, 17 (emphasis added). Equally troubling, Kam was *completely* without knowledge regarding the recall-performance requirements imposed on common carriers by the Federal Motor Carrier Safety Regulations. *See* Dep. of Allan Kam, pp. 64-66, 83-84. Accordingly, as Kam's purported testimony relating to the mailing of recall notices is not admissible pursuant to FED.R.EVID. 702 and *Daubert*, and his testimony should be excluded.

## II.  THE *DAUBERT* STANDARD

The admission of expert testimony is governed by FED.R.EVID. 702. That rule provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED.R.EVID. 702.

Rule 702, as amended, is a reflection of the U.S. Supreme Court's decisions in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *General Electric Co. v. Joiner*, 522 U.S. 136 (1997), and *Kumho Tire Co., Ltd. v. Carmichael*, 119 S.Ct. 1167 (1999). In *Daubert*, the seminal case in this area, the Supreme Court explained that Rule 702 establishes two fundamental criteria that the party offering expert testimony must satisfy before that testimony becomes admissible in a federal trial. *See Moore v. Ashland Chemical Inc.*, 151 F.3d 269 (5th Cir. 1998); *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999).

First, Rule 702 mandates that the testimony be "reliable." *Daubert*, 509 U.S. at 589-90. Specifically, Rule 702 dictates that expert testimony must be based on some manner of "scientific, technical or other specialized knowledge." *Id*.

> The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation. . . . [I]n order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation . . . .

*Daubert*, 509 U.S. at 590.

The *Daubert* Court set forth a number of nonexclusive guidelines that a trial court may consider in determining whether proffered expert testimony qualifies as sufficiently "reliable" under Rule 702. Those guidelines include:

> (i) whether the proffered conclusion lends itself to verification by the scientific method through testing, and whether the technique or conclusion has in fact been tested;
>
> (ii) whether the opinion has been subjected to peer review;
>
> (iii) the known or potential rate of error, and the existence of standards controlling the operation of the technique applied; and
>
> (iv) whether the technique or method is consistent with the generally accepted method for gathering the relevant scientific evidence.

*Daubert*, 509 U.S. at 593-94; *Cummins v. Lyle Industries*, 93 F.3d 362, 368 (7th Cir. 1996).

Rule 702 also requires that the proffered testimony be "relevant," that is that it be helpful to the trier of fact by "fitting" the issues joined in the particular litigation. *Daubert*, 509 U.S. at 591. In this regard, proffered testimony may so clearly fail to demonstrate what it purports to show that it becomes irrelevant. *See Pestel v. Vermeer Mfg. Co.*, 64 F.3d 382, 384 (8th Cir. 1995) (excluding as irrelevant opinion that attempted but wholly failed to establish existence of feasible alternative design).

While *Daubert* addressed only expert scientific testimony, subsequent decisions have established that *all* expert testimony must meet the "reliability" and "relevance"

tests of Rule 702. *Kumho Tire*, 119 S.Ct. at 1174-75. Discussing the use of *Daubert* outside of the area of scientific testimony, the Supreme Court has explained:

> a trial court may consider one or more of the specific factors that *Daubert* mentioned when doing so will help determine [the] testimony's reliability. But . . . the test of reliability is "flexible," and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination.

*Kumho Tire*, 119 S.Ct. at 1171. While pointing to this pragmatic flexibility, the Court also described the "general principles" that underlie Rule 702 and the "objective" at which *Daubert* and its progeny aim:

> The objective of [*Daubert*'s] requirement is to ensure the reliability and relevance of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in that field.

*Kumho Tire*, 119 S.Ct. at 1176. Thus, "where [the expert] testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, the trial judge must determine whether the testimony has a 'reliable basis in the knowledge and experience of [the relevant] discipline.'" *Id.* at 1175 (citation omitted) (interpolation in original).

Kam's testimony does not meet this standard.

### III. ARGUMENT

#### A. <u>Kam's opinions are not based on scientific, technical or other specialized knowledge.</u>

Kam effectively conceded in his deposition that he has conducted *no* independent research or investigation to support any of the opinions that he plans to offer.

6

> Q. And just so it's clear on the record and you allude to it in your report, the bases for you opinion that Peterbilt should have discovered the problem sooner is that after being notified by NHTSA and going back and looking at claims, there were, in fact, numerous claims relating to door popping open?
>
> A. Yeah, the claims preexisted NHTSA opening its investigation. . . .

See Exh. A, Dep. of Allan Kam, p. 122.

> Q: All right. And I just wanted to clarify that, that you haven't done any independent investigation into looking at dealership records and all of that sort of stuff, all you've done is listen to what the P.A.T. officials told you to form the basis of your opinion [that PACCAR should have had a better internal system in place for recognizing vehicle problems]?
>
> A: Yeah, I was told by the P.A.T. officials that the Tucker vehicle had been to a Peterbilt dealership for service after the initiation of the recall, after June 2001, but before the March 6th, accident.
>
> Q: Okay. And it's only that conversation with the P.A.T. officials that you used to base this opinion on, right?
>
> A: Yes. To base my assumption that the vehicle had been to a dealership, what they told me, yes, of course.

See Exh. A, Dep. of Allan Kam, pp. 129-30.

When questioned as to the bases for his opinion regarding PACCAR's supposed failure to mail P.A.T. a first recall notice regarding the Tucker vehicle, Kam again conceded the lack of reliance on any objective evidence.

> Q: Okay. Tell me everything that you base [your] opinion on [that with respect to the Tucker vehicle, no first recall letter was sent in June 2001]?
>
> A: Well, . . . I was told by the P.A.T. officials that they did not receive a notification letter with respect to the Tucker vehicle until – I think it was March 3rd. I think it was the Monday before the accident when it came with a stack of other letters and that they had other – other notification letters for other vehicles and that they had several vehicles which had been subject to the campaign that they did not get a first notification – the so-called notification letter.

7

> So I thought it was unlikely that it was – this was just one letter that got lost in the mail, the Tucker letter, because there were several other vehicles that they had also and I think I talked earlier . . . about the fact that the second notification letter with respect to the Tucker vehicle was addressed to the – Pensacola Transport, the prior owner[. . . .]"

Exh. A, Dep. of Allan Kam, pp. 132-33. While Kam goes on to suggest that recall response rates published by PACCAR in quarterly reports following the issuance of the second letter suggests problems with the circulation of the first letter, Kam concedes that he did not review the response rate for the preceding quarter and, naturally following, has no appropriate starting point to measure a supposed spike in responses. *See* Exh. A, Dep. of Allan Kam, p. 139. Equally egregious, Kam is wholly unaware of the concurrent obligations imposed on common carriers by both NHTSA and the FMCSR.

> Q:   Yes. In fact, P.A.T. has a federally regulated statutory duty to implement and make safety repairs on its vehicles, doesn't it?
>
> A:   If you're talking about a NHTSA regulation, which is what my expertise is in, I'm unaware of any such regulation. If you're talking about something about the motor carrier safety administration, that not my area.
>
> Q:   Okay. Do you have any opinions or any knowledge or any experience or any expertise whatsoever in the Federal Motor Carrier Safety Regulations?
>
> A:   That's not my area.
>
> Q:   Are you aware of the fact that there is a specific Federal Motor Carrier Safety Regulation that places an affirmative duty on a motor carrier such as P.A.T. to implement any safety repairs on its vehicles that it becomes aware of?
>
> Ms. McKinley:   Object to the form.
>
> A:   It's simply not my area of expertise.
>
> Q:   Are you aware that the same body of regulations puts a duty on owners like P.A.T. to inspect, maintain and repair its vehicles?

>   Ms. McKinley:     Objection.
>
>   A:   Same Answer. I worked for over 25 years at NHTSA, . . ., which regulated the manufacturer of vehicles that didn't – as a general statement, NHTSA doesn't regulate vehicles in use. . . .

Dep of Allan Kam, pp. 64-66. Eliminating any doubt as to his ability to testify as to the complete picture of imposed obligations:

>   Q:   Do you agree with me that the Federal Motor Carrier Safety Regulations put a duty on motor carriers such as P.A.T. to implement safety recalls that it receives?
>
>   Ms. McKinley:     Object to the form.
>
>   A:   The same answer. And maybe I can help you out a bit. I am simply not testifying about Federal Motor Carrier Safety Regulations. That's not my area.

Dep. of Allan Kam, pp. 83-84.

P.A.T. has not met its burden of demonstrating that Kam's opinions are grounded "in the methods and procedures of science" and are "based on actual knowledge" rather than "a belief or unaccepted speculation." *Daubert*, 509 U.S. at 599. All Kam has is the regurgitate theories suggested to him by P.A.T. officials. Simply put, no factual basis exists upon which Kam can rest his opinions. With a conceded lack of knowledge to anything FMCSR-related, Kam certainly cannot testify as to the complete realm of obligations imposed under the governing federal framework. Accordingly, he is in no position to suggest what was satisfactory or unsatisfactory. Further, he has not attempted to locate objective sources to substantiate the wholly subjective basis of his purported opinions. In fact, Kam failed to examine the totality of objective information contained in PACCAR's quarterly reports providing recall response and, instead, merely points to a single report after the second recall letter and, without the benefit of any comparable

point of reference, concludes that it points to a failure in the mailing of the first recall letter. Accordingly, because his opinions in this case are wholly unsupported and unverifiable, Kam's opinions are irrelevant and unreliable. The court should exclude Kam's testimony in its entirety. *See e.g., Bourelle v. Crown Equipment Corp.*, 220 F.3d 532, 536-38 (7th Cir.2000)(holding that alternative design theory properly excluded where expert conducted no scientific testing in support of theory); *Jaurequi v. Carter Manufacturing Co. Inc.*, 173 F.3d 1076 (8th Cir. 1999)(finding expert's failure to test utility of proposed alternative design was permissible reason for district court to exclude testimony).

**B.      Kam's opinions do not assist the trier of fact.**

Expert evidence must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591; *see also Watkins v. Telsmith, Inc.*, 121 F.3d 984 (5th Cir. 1997) (when expert testimony is offered, the trial judge must perform a screening function to ensure that the expert's opinion is reliable and relevant to the facts at issue in the case). Expert testimony will assist the trier of fact "if it concerns matters that are beyond the understanding of the average lay person. Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *United States v. Frazier*, 387 F.3d 1244, 1262-63 (11th Cir. 2004). Moreover, "nothing in *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Michigan Millers Mut. Ins. Corp. v. Benfield*, 140 F.3d 915, 921 (11th Cir. 1998) (*quoting General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Thus, a district court can and should exclude expert

testimony that is "imprecise and unspecific," or whose factual basis is not adequately explained. *Frazier*, 387 F.3d at 1266.

Kam's opinions offer nothing more than P.A.T.'s factually-disputed position. His opinions certainly do not concern matters that are beyond the understanding of the average lay person, much less matters of any import. His first opinion, that the recall should have been issued earlier, has no bearing on this case because it is undisputed that the recall was initiated approximately nine (9) months before the accident. This is not an accident where the injury predated the recall. In fact, P.A.T. concedes that it received the second recall letter *before* this accident. Kam's second opinion equally ignores the facts applicable to this case – *i.e.*, the appropriateness of PACCAR's internal system for recognizing vehicle problems is not an issue where it worked sufficiently well to provide notice to P.A.T. nine months prior this accident. Kam's last opinion – that PACCAR did not send the first recall notice regarding the Tucker vehicle and, therefore, the second recall notice was untimely – simply fails to aid the jury in any way and is the exact type of testimony a lay person can comprehend. Furthermore, the entirety of his opinions lack any consideration whatsoever of FMCSR regulations, regulations which clearly work concurrently with NHTSA to create and define the totality of the recall relationship between manufacturers and common carriers. Instead, Kam concedes that his foundational basis is his conversation with P.A.T. officials. *See* Exh, A. Dep. of Allan Kam, pp. 132, 138. Kam's testimony is nothing but a rank regurgitation of P.A.T's factual position in this case. It certainly is not the type of intellectually-rigorous material contemplated by *Daubert*. His opinions are not only elementary, two of the three have

absolutely no bearing on any issue remaining in the case. Therefore, the court should exclude his testimony.

## MEMORANDUM OF LAW

Pursuant to Local Rule 3.01(g), counsel for PACCAR, Inc. certifies that he has conferred with counsel for P.A.T. as to the content of this Motion prior to involving the Court, but that the parties cannot agree on the proposed resolution of the Motion.

Respectfully submitted on this the  13  day of  Dec.        , 2005.

Respectfully Submitted,

_____
One of the Attorneys for Defendant/
Third-Party Plaintiff

WILLIAM C. CORLEY, ESQUIRE
Florida Bar No.: 338885
Post Office Box 447
Jacksonville, FL 32201-0447
Telephone: (904) 398-0900
Facsimile: (904) 399-8440

AND

Lightfoot, Franklin & White, L.L.C.
Jere F. White, Esq.
Alabama Bar No.: (WHI007)
J. Banks Sewell, Esq.
Alabama Bar No.: (SEW003)
J. Chandler Bailey, Esq.
Alabama Bar No.: (BAILC4526)
Enrique J. Gimenez, Esq.
Alabama Bar No.: (GIM001)
The Clark Building
400 North 20th Street
Birmingham, Alabama 35203
Telephone: (205) 581-0700
Facsimile: (205) 581-0799

## CERTIFICATE OF SERVICE

I hereby certify that I have on this __13__ day of __Dec__, , served the foregoing upon counsel of record for all parties to this proceeding, via electronic filing as follows:

> Katherine E. McKinley, Esq.
> Zimmerman, Kiser & Sutcliffe, P.A.
> 315 East Robinson Street, Suite 600
> P. O. Box 3000
> Orlando, FL 32808

_____
OF COUNSEL